All right. Mr. Walker, we'll hear from you first. Good morning, Your Honors. I'm appearing today on behalf of all three petitioners in this matter, seeking to vacate the air tour management plan that were entered with respect to Badlands National Park and the Mount Rushmore Monument. It is our position that the, what are called ATMPs, the air tour management plans, were the result of haste. And I know that my colleagues are on the other side dispute that, but this came into being in 2000, and up until 2020, when I believe one of my colleagues here brought, his organization brought suit to enforce the act, the agencies involved, the FAA and the National Parks Administration, had not implemented a single plan in any of the national parks that were specified on the list that were subject to review. Having said that, then because of the court decision in the D.C. Circuit, there was a short time period by which the agencies were required to reply, and not wanting to cast stones at either one of the agencies here, I do think some mistakes, or I believe that we can show that mistakes were made here in a rush to get to comply with the court's order, even though there was an extension granted to the agencies to do so in this particular case. In particular, the statute at issue here is the National Parks Air Tour Management Act of 2000, and that incorporates a requirement to follow the National Environmental Policy Act. A number of the issues that we have set forth in our briefs relate to what we believe are arbitrary and capricious determinations made with regard to the National Environmental Policy Act. And that has been challenged by the respondents here, in that we don't, that the petitioners don't have prudential standing, and I'd like to address that rather than save that for rebuttal. The National Parks Air Tour Management Act does recognize that affected parties can challenge the air tour management plans that are implemented by the agencies, and part of the process mandated under that Air Tour Management Act is to comply with the National Environmental Policy Act, which I'll refer to as NEPA, which affects the determination and the outcome of the air tour management plans that are then imposed on those parks. Okay, the petitioners here have been operating in both of these parks since well before 2000, and much has been made of the fact that in both the parks that the petitioners hold over 99% of the interim operating authority for these parks that was the interim status given until an air tour management plan was implemented. Now, the implication is, in the respondent's brief, is that somehow they held some sort of monopoly operation. It just happened that they were the only operators in that, in those parks at the time this act was implemented, and that there were, and the other, in each case there was another operator who was not very active, and therefore had a very small percentage, but that sort of froze the status quo in place until the air tour management plans were worked out. So I would like to, you know, I draw the court's attention to that only because I would not like this to, the court to take away from the arguments that I anticipate will be made that these petitioners had some sort of inappropriate hold on these parks. They were simply there and the ones operating in that area, and apparently there was not enough competition for others to try to take them on. Anyway, so what I'd like to... Do you have any legal argument as to why there was error by the agency? Yes, I do, Your Honor. Carol, you've used five minutes, and I want to... Yes, I apologize, Your Honor, but I'm trying to be brief here, but give the proper context. But what we say, what our position here is that there are four areas of error here that we believe are of the capricious and arbitrary nature, and those mostly relate to the aspect of NEPA and its application into the National Parks Air Tour Management Act, and those have to do with the data that was used to determine such things as the ambient noise levels in the parks and what data was relied on for the noise created or reportedly created by the operation of helicopters over these national parks. The agencies relied on 2003 data for their modeling and for the ambient noise levels and didn't do anything to update that and say in their papers or in the change, but there wasn't any verification that the 2003 data was still valid. And this is despite the Federal Aviation Administration having drawn to the agency's attention their concern over increased motorcycle riders entering the parks and large diesel-powered buses hauling tourists to these sites. Counsel, the data may not have been perfectly up to date or maybe not even ideal, but does that make it arbitrary and capricious to use that data? Well, it does because the Act mandates to determine the issue under existing conditions, and between 2003 and 2020 when the ATMP process was restarted by the agencies, tourism has greatly increased during that time, and so there should have been at least some update of one of the agencies actually questioned it, but it was disregarded. Did you ever attempt to make or develop any evidence or submit any evidence into the record for their consideration? Well, it was called to their attention that there was a mismatch between the data being used, being the 2003 ambient data, and then the 2017 through 2019 operational data for the operation of the helicopters. Right, but you didn't ever produce like an expert report where somebody said, you know, well, this data is inadequate and here's the reason why? No, Your Honor, we did not. But I also, you know, I'm sure that Your Honors are well, I mean, this is not an adversarial proceeding below as the briefing of the government respondents seemed to indicate there were a lot of arguments of what we should have done and submitted, but, you know, the petitioners here are, you know, not in a position of a normal adversarial position to call witnesses, to challenge the data, and, you know, questions are raised during the comment period, and there were many comments raised on these issues in question, and the outcome of that is that the record doesn't show any discussion of why these sets of data were chosen, and that the lack of explanation seems, is actually what makes this arbitrary and capricious because there's no rationale given for these things. Well, I believe they said this was the most recent study available. Yes, but that... Now, when you say ambient noise, are you referring to the natural environment or are you referring to the human? Well, it's the natural environment to which they compare to the noise from the helicopters or the... So when you say natural, do you mean just the waterfalls and the animals, or do you mean also highways and, you know, a... Well, if this... Go ahead. I'm sorry. If this was isolated land, you know, in a theoretical world, it would just be the, you know, the natural... I'm not asking a theoretical question. No, but I'm just... I don't know what you mean when you say that. It includes the human-caused noises in addition to what is naturally occurring there, apart from the helicopters. Apart from the helicopters. And you're claiming that, or you're suggesting, I think, that there was some change after 2003 with the human element? Yes. You said you referred to some new highway? Well, in our briefs, we pointed to the fact that there were highways and other structures and some remote or restructuring of the physical elements at the Mount Rushmore facility, but... What is it that changed the noise level, in your view, since 2003? I believe it is the increased tourism, which is transported mainly to these sites by tour buses with diesel engines, and also by increased number of motorcycle riders entering these parks. Are there increased motorcyclists in the Black Hills and in the Badlands Park, mostly during a narrow window during the Sturgis bike rally? I couldn't answer that, Your Honor, but, you know, I think... Because that rally has grown much larger through the years, and the question kind of becomes, is that if the overall number of motorcycles has increased dramatically, but it's still only over a three-week period, that's different than what happens, like, the other 49 weeks out of the year? Your Honor, I couldn't be that specific about it. All I can say is that the record shows that the FAA itself, the local flight standards division, raised this issue about the increased noise caused by motorcyc... Let's say there was some increase based on tour buses. Wouldn't the helicopters still add the same additional noise on top of what's present now? Well, it would, but the comparative impact of it would... You have an ultra-sensitive area, and you're injecting new noise into it. Obviously, the impact of that would be more significant than if you already have an existing number of noise. I mean, just as... Why is that? Why would it be... You mean if you've already added some noise with tour buses, then you have to allow additional outside noise? Well, it wouldn't... Well, I can only give you an example. You know, if you're a city dweller, you're used to hearing a lot of noises, and some of them don't really register with you as much as if you were someone who lives in a rural area and don't really hear many noises other than... I understand that. I just wondered why even the city dweller might not want helicopters hovering over the apartment building. I think that's a fair question. But the issue here is whether or not these helicopter companies could be outright banned on the data and the decision-making of these two agencies, because they have an obligation to follow the Administrative Procedure Act. And in doing so, they cannot be arbitrary and capricious here. And... If you wish to save any time for rebuttal, you're down to a minute and a half. Yes. You may do so. So I'm not sure if I've already used up all of my rebuttal time other than... You've used up all but one minute and 24 seconds. So if you wish to continue, you may, or you may reserve that. But if you continue, you will use your rebuttal time. Okay, I will continue, because I think it's more important to move through some of these issues. Also, one of the principal reasons that the agencies banned the helicopter procedure were based on tribal objections to overflight of what they deemed sacred grounds. Well, Counselor, I wanted to ask about that. That seemed to be a rather unusual part of the environmental assessment here. It's my understanding that an agency action can be arbitrary and capricious if it takes into account factors that Congress did not intend. What statutory basis was there for considering the spiritual beliefs of certain religious groups in this environmental assessment? I think that is part of the actual National Parks Air Tour Management Act. Well, I look at the Act, and it refers to tribal lands. Are these tours on tribal lands, or are these on public parks? Well, they're national parks, so they are surrounded by tribal lands. And I think these tribes also believe that the parks themselves are part of their sacred. The government's brief says that this was a primary driver of the ATMP. Yes. And the ban, the driver of that decision was to expel helicopters over the national parks to reduce noise over the national parks. But the result of that is that it pushed them outside the boundaries of the parks still over the land that the tribes were complaining of, of overflight. In fact, the tribes wanted no overflight of that territory anywhere in the Black Hills region, even by commercial, you know, aircraft, not just helicopters. So the driver of that, you know, pushing them outside the boundaries of the park didn't really address the tribal concerns that they claim that they hang their hat on, because it just pushed it more into the actual tribal lands, because the helicopters would operate outside the park boundaries. Very well. Your time has expired. Thank you for your argument. Thank you. All right. Ms. Shugart-Schmidt, we'll hear from you. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. Caitlin Shugart-Schmidt here on behalf of the federal respondents. Your Honors, in recent years, the approximate three million visitors to Mount Rushmore and Badlands have been subject to incessant loud helicopter noise from overhead air tours. Noise so loud that it often interferes with the ability of park rangers or others to lead guided tours or to do interpretive programs within these parks. After 20 years of work, the National Park Service and the FAA reasonably determined, consistent with Congress's expressed statutory mandate, that in order to protect park resources, it was necessary to prohibit air tours in these particular parks, something not necessarily common across other parks in the country. While the petitioners here are understandably frustrated by the outcome of that process and the end of the sort of happenstance monopoly, that is not a reason for finding these decisions to be arbitrary and capricious, and we ask that you deny the petitions. I'm happy to just quickly start with the note on the consultation with tribes and just point out that NEPATMA, in addition to talking about impacts on tribal lands, also specifically talks about the impact of commercial air tour operations upon natural and cultural resources. And those cultural resources, as is discussed, you can see this in the decisions themselves under the Section 5, which is the justification for measures taken, talks extensively about the sort of impact of air tours on the cultural practices. Do you agree that these air tours are not on tribal lands? Currently, my understanding is that they are not in the sense that there are no air tours that my understanding historically flew on the southern unit of the Badlands National Park, which is coextensive with a reservation. My understanding is that there are, you know, areas around these parks, but no, my understanding is that historically air tours have not flown under the interim operating authority directly over reservations, reservation land. Is it a little bit odd that a primary driver of an environmental assessment would be the spiritual beliefs of a certain group? So I think here we should look to what specifically Congress articulated, right? Congress said we should consider four primary categories of things, natural resources, cultural resources, the visitor experience, and impacts on tribal lands. And I think if you go back to… But the tribes believe that Mount Rushmore itself is a desecration of their lands and their spiritual beliefs, so why is it not arbitrary and capricious to allow millions of people to walk on the mountain but not take a few air tours? So I think we should look specifically at what the agencies, what sort of authority the agencies were operating here, right? NEPATMA says the FAA and the National Park Service should consider what is happening in the airspace above these particular group of national parks. That's it. They're not supposed to make broad pronouncements on otherwise how these park lands are supposed to be used or who should use them. The question is, do air tours over these particular parks unacceptably impact these categories of things? And I actually think here that if you go through the full record, it becomes very clear that the number one overriding reason why the decision was made that the appropriate alternative was to do a prohibition on air tours was because of the impact on the visitor experience itself. Why isn't that enough? There are a lot of other things in the record that seem to go far field, some of which don't seem to be supported very well by evidence, and I would specifically refer to the effect of the noise on bighorn sheep and peregrine falcons. I don't really see much evidence in the record to support the conclusions made. So I think it's helpful to look at the sort of light touch with those conclusions in particular that the service or that the agencies made here. So, for example, with respect to bighorn sheep, you know, there was never a air tours at a certain level are going to kill bighorn sheep or cause, you know, absolutely unacceptable population impacts. Well, one of the concerns I had was that the decision was to ban the air tours entirely, even though the concern was over lambing season, which would be maybe a few weeks, not 365 days a year. Which I think is why it's important to go back to the fact that Congress said that the agencies had to consider all four of these factors, and the primary factor that was relied upon here was the severe impact on the visitor experience. You know, the fact that these air tours also likely, based on the research and the evidence in the record, add some additional stressor to species is something that the agencies should have noted, because it is one of the things that NEPATMA specifically says they should consider. But it's not the overriding reason here for the decision that was made to prohibit air tours in this area. I want to go back to the cultural practices piece a little bit. My understanding is that religious practices occur in the Black Hills, on and off reservation lands, because the Sioux Nation believes that the Black Hills are sacred, whether they're part of the reservation or not. My understanding is that the Sioux Nation has never consented to the loss of the rest of the Black Hills and has not accepted the benefits of the judgment that is now worth more than a billion dollars sitting in the judgment front, right? And so there are, in fact, cultural and spiritual practices that are still taking place on a regular basis in the Black Hills. That's my understanding. And as far as the tribes are concerned, that is a huge bone of contention between them and the United States government, so much so that they have never accepted what is now, I think it's a billion dollars, because the government froze the interest on it. It's a 1971 or 72 Supreme Court case, right? Well, I certainly think it's clear from the record here that there were extensive consultations between the agencies and any tribes that might feel like they have cultural practices or might have historic ancestral practices in these areas, and the agencies took those obligations seriously. I think it's also clear from the record here that the tribes understood, the tribes that were consulted. And for example, this is the appendix at 2369, that there would be a displacement of air tours should there be a prohibition over this ATMP area, probably more tours happening outside. They understood those things, and their request was still that air tours be prohibited over here in order to avoid impact on cultural practices. But the consideration of cultural practices is certainly something that NEPATMA expressly contemplates and directs the agencies to consider in their analysis. And in any event, that's less than the visitor's experience? Similar to the species, yes. It is really the visitor experience impact tiers that drove these decisions. And I'm happy to turn with that to the noise analysis that was briefly discussed before, if that would be helpful. And just to clarify here that yes, there is no question that the sound data from 2003 is older data, and it is perhaps older data than anyone would like to use in making a decision, but there is absolutely no evidence in the record that it is unreliable data. And I'd like to make a few points there if I could. The first is that, of course, this whole discussion is really only about potential changes or alleged changes to Mount Rushmore. So I'd just like to separate a little bit that there are really no allegations even that there have been substantive changes to the soundscape in Badlands. With respect to Mount Rushmore, I'd just like to point out a few of the sort of factual contentions that have been made here that allege that there has been some substantive change in the background, you know, either natural ambient or existing ambient noise for the park. You know, the first was that there is sort of this vague allegation that there has been construction in the park or changes in the park since 2003. But all of the construction in the park, the remodeling of the visitor center, the change in the parking lot configuration, all of the sort of big renovations that have occurred in Mount Rushmore were completed in 2001. And since then, there have been, you know, small-scale projects like replacing an elevator or repaving a sidewalk, but nothing that would reach the magnitude of having any impact on the sort of soundscape of the park. And, of course, because there haven't been major changes to the parking lot, there's also no change in the amount of, you know, tour bus parking space or anything like that. Also, the number of visitors at Mount Rushmore has been generally stable over the past 20 years. In 2003, there were 2.2 million visitors. In 2018, there were 2.3 million visitors. And in 2019, there were 1.9 million visitors. So there hasn't been some massive increase in visitation that would change that background soundscape. I do have a question. Go ahead. Is that information that you just cited in the record? I'm not sure if the full listing of visitor data is in the full record, but it is certainly on the National Park Service statistics website, and this court could consider if it wanted. The concern is whether the agency was required to do the analysis you just did and conclude that we think the 03 data is reliable because there's no basis to think of a change. So the agency certainly considered this data and the data that it had in front of us in both the record of decision, the environmental assessment, the finding of no significant impact, and the noise technical analysis that it did. So the agency having no reason to think, based on its knowledge of the circumstances of these parks, the community, changes, et cetera, that there was a reason that this data would have been unreliable, it was reasonable that the agency moved forward with it. And if there had been any particular concern that the agency had overlooked, the opportunity for the petitioners to raise that would have been either the public scoping process, the opportunity to comment on the draft EA, or in the public meetings that were held. And certainly the petitioners can't now sort of wave a flag and say, oh, the agency failed to consider something without even articulating what that specific thing would be that would have changed the soundscape of the park, because there's nothing in the record or nothing that's happened at the parks that would have appreciably changed that in any way that would undermine the conclusions of the noise analysis here that were done by an independent noise modeling group. I'm happy to address questions about other topics. It's my understanding that part of the reason the government or the agencies chose to impose a total ban on aerial tours rather than imposing altitude and route restrictions was because of the location of a privately owned heliport. That seems a little arbitrary to me, because if you imposed altitude and route restrictions, they would simply move the heliport. So I don't think that was the only reason. That was certainly a reason that has been mentioned briefly at points in the record. But I think there were lots of reasons why there weren't good options for altitude or route changes for either park. With respect to Mount Rushmore, the concern is that the park is just simply too small and too concentrated already for the routes to make any meaningful difference in terms of noise impacts. With respect to Badlands, there were concerns about impacts on wilderness. So this is the appendix at 344. If routes were changed, the really only place for them to deviate is then to go over wilderness areas that are in the park. That's also at 630 and at 596. And then there was also a note that with the existing location of the helipad, if a helicopter was to take off and try and reach a greater altitude, that would actually lead to more noise impact in the park, because the helicopter would be right on the border of the park going up to this level. And of course, the agencies did this public scoping where they said, here are the four alternatives that we're planning to consider that we think are a reasonable range of alternatives. And that was the opportunity for petitioners to say, we have another idea. We'd like you to consider alternate routes. We'd like you to consider alternate altitudes. We'd like to consider what you might do if we said we were willing to move the heliport. But the petitioners here did not do that, and they can't now turn around and fault the agency for failing to consider an alternative that they never presented. Very well. Thank you for your argument. Thank you. Mr. Jenkins, we'll hear from you. Your Honors, may it please the Court. I'm Peter Jenkins with PEERS. That's Public Employees for Environmental Responsibility, a nonprofit group that has been a primary driver of the development of these air tour plans initiated through our 2020 mandamus case before the D.C. Circuit, which is cited frequently in the brief. It's called In Re Public Employees for Environmental Responsibility. The D.C. Circuit is still maintaining jurisdiction over that case to ensure that these air tour plans are actually completed. So we're happy in this case to be on the same side with the government, as we're defending interveners, supporting the government's position, and we endorse everything that counsel has stated. We've been on the opposite side of the government in another case, opposing the way they did their environmental compliance. Here, our plan is an interesting one. It's the Coalition to Protect America's National Parks, or CPANP, which is made up of retired Park Service staff up to former superintendents, all retired but conglomerated together to ensure that the mission that they devoted their careers to is still carried out by the Park Service, and we're happy to represent indeed the former superintendents of both of these parks involved and the former chief rangers of these parks who fully support the plans that were developed after they left. Let me address the initial argument that Mr. Walker made, which was, and it's repeated in the petitioner's brief, that somehow that these two air tour plans were rushed and under a compressed schedule. That's just not the case. We know because we were involved in a D.C. mandamus case that was trying to push them to get these air tour plans done. The court initially ruled that they should be done by 2022. The government came in and asked for an extension of time, including for these two air tour plans, and got an extension until December 31, 2023, over our objection, but they got the extension, and these two plans were done by November. We wanted to rush them, but we couldn't get it. But we didn't get it, so it's false to say that they were rushed. There's absolutely, and we briefed it on page two of our brief, there's nothing in the record that supports that they were rushed or compressed at all. Now, on to the concept of sound and ambient sound, I think there's some misunderstanding about that, but ambient sound is the natural sound. It doesn't change. We're talking the sound of the waterfalls and the wind and so on without human activities, and that is addressed in the proposed supplemental administrative record piece that we urge the court to take a look at. That motion is still before you, and you can decide it. To try to clear up this issue, we retained Dr. Kurt Fristrup, a Ph.D. from Harvard in bioacoustics who used to work for the Park Service for 15 years. He's retired, not a member of this coalition who we represent, but we retained him to take a look at the administrative record and the work that had been done by the Park Service on the sound and to assess their study, and he took a look at it and said, this is state-of-the-art, this is an impeccable study, both with respect to Badlands and Mount Rushmore, and he said that the 2003 data was perfectly reliable and the most recent data available. Did the agency also consider the human noise? Well, that's layered on top of the ambient noise, so there's a very detailed program and structure that they used to do their noise analysis looking at all these different layers of sound, and he said that the 2003 data that's been questioned by petitioners was fine. Then you do the human impact on top of that. Well, did the 2003 data include the human impact? No, it's basically the ambient, natural sound of the parks without the human impact. That needs to be cleared up. So in conclusion, as counsel has indicated too, since May 13th of last year when those two plans went into effect, literally hundreds of thousands of visitors to Mount Rushmore and Badlands have benefited from the fact that these plans have created much more peace and quiet in this park, and there's no reason before this Court to disturb those findings and those facts. If there's any more questions, I'd be happy to answer. Very well. Thank you for your argument. Thank you. Very well. Thank you to all counsel. The case is submitted and the Court will file a decision in due course.